JENRETTE TRANSPORT COMPANY v. ATLANTIC FIRE INSURANCE COMPANY.

(Filed 26 November, 1952.)

**1. Insurance § 43b—**

A policy indemnifying insured carrier against loss of cargo specifically excluded loss caused directly or indirectly by the load or any portion thereof colliding with any object unless the vehicle also collided with such object. The cargo was damaged in a collision with some part of an underpass. *Held:* By the terms of the policy, insurer was not liable if no part of the truck or trailer collided with any part of the underpass, and it is immaterial that stakes of the body holding the cargo were damaged if such damage resulted solely from the collision of the cargo alone.

**2. Trial § 23a—**

Even though on motion to nonsuit, the evidence must be considered in the light most favorable to plaintiff, it must do more than raise a suspicion, conjecture, guess, surmise, or speculation as to the pertinent facts in order to justify its submission to the jury.

**3. Insurance § 43b—**

In determining the issue of whether some part of the vehicle collided with the underpass or whether the cargo alone collided therewith within

the meaning of a policy of cargo insurance, testimony of a witness that some two weeks after the collision he found certain "scarring" on the right pier of the underpass about seven feet from the ground has no probative value and should have been excluded on insurer's objection.

**4. Same—Evidence held to raise mere speculation as to whether truck or its cargo collided with object, and nonsuit was proper.**

Insured's driver testified on direct examination that he drove slowly under an underpass, heard a lot of noise, stopped the truck before the rear had cleared the underpass, and found part of the cargo had been knocked off and a part of the stake body of the truck, which secured the cargo, had been broken. He also testified that the tops of the tanks transported in the front part of the truck had been bent backward. Insurer introduced a sworn statement signed by the driver shortly after the accident in which he stated that no part of the truck or trailer came in contact with any part of the underpass. Upon insured's cross-examination of the driver on the ground that he was a hostile witness, the driver testified that his statement was based on opinion only and that he did not actually know how the collision occurred. *Held:* Plaintiff's testimony raises no more than speculation or conjecture as to whether any part of the tractor or trailer collided with any part of the underpass, and therefore insured's motion to nonsuit under a clause of the policy precluding liability if the cargo alone collided with any object, should have been allowed.

**5. Trial § 22b—**

Defendant's evidence which is not in conflict with that offered by plaintiff but which explains or makes clear plaintiff's testimony is properly considered on motion to nonsuit.

PARKER, J., took no part in the consideration or decision of this case.

APPEAL by defendant from *Godwin, Special Judge,* January Term, 1952, and *Carr, J.,* February Term, 1952, of WAKE.

This is a civil action to recover on contract of insurance.

The defendant, under date of 27 April, 1948, issued and delivered to Gresham Petroleum Transport, Inc., its Motor Vehicle Cargo Insurance Policy effective from the above date until 27 April, 1949. The annual premium of $263.00 was paid. The policy, with the approval of the defendant and by proper endorsement, was thereafter assigned to the plaintiff and the plaintiff was duly made the assured therein on 28 August, 1948. The amount of loss recoverable under the terms of the policy is limited to $1,500 for any one disaster.

On the face of the policy appears the following: "THIS POLICY DOES NOT INSURE—The legal liability of the Assured for: . . .

"(g) Loss or damage . . . caused directly or indirectly by the load or any portion thereof coming into contact with any other object unless the carrying vehicle also collides with such object; . . ."

The plaintiff alleges, "That on or about April 7, 1949, while the said policy was in full force and effect, one of the plaintiff's trailer trucks

covered by the said policy was loaded with thirty (30) fuel tanks and was en route from Raleigh, N. C. to Friendship, N. C.; that when the said trailer truck had reached a point on the highway, in or near the city limits of Greensboro, N. C. and was being driven along the said highway and was about to pass under an overhead bridge or through an underpass under the said bridge, the said truck and some of the tanks which were the said cargo on the truck, collided with the side supports of the said bridge, or underpass; that as a result of the said collision, the said truck and its cargo were so badly damaged that 19 of the fuel tanks were not accepted by the concern which had ordered the same and were a loss to the plaintiff to the extent and value of $557.25."

Roy Hargis, a witness for the plaintiff, testified: "In April 1949 I was a driver for plaintiff, Jenrette Transport Company. . . . On April 7, 1949 I was driving one of their trucks on a trip from Raleigh to Friendship, N. C., through Greensboro. I had a load of storage tanks, . . . I know there were different sizes on there, the larger ones in front and the smaller ones were behind. As to how they were loaded on that truck, they were standing straight up—standing on end. . . . You reach Greensboro on #70 highway and the truck lane turns to the left on #421 going south and it's just about a block from there to an underpass under a railroad. It is downhill from the place where you turn off about a block away. The underpass has a division between it, one lane on the right-hand and one on the lefthand; there's a division between the sidewalk on the other side of the bridge, too. There are supports or piers up from the division in the center and from the curb up to the underpass to support the underpass of the railroad. You have to turn out a little bit to miss that center support. I wasn't paying any mind to the underpass as I had been through there several times before with the same sort of load and what happened to the tanks I don't know. I just heard a terrible noise as I started under the underpass. I stopped the truck then with the back end of it just before it got out from under the underpass; at the time I was going slow, would say I was going 12 or 15 miles an hour only. When I got out of the truck I found that some of the tanks were off the truck on the righthand side of the underpass and sidewalk and that part of the stake body of the truck had been broken off. Q. Did you find that the side of the truck was damaged and that a number of the tanks were off the truck? A. Yes sir, the side of the truck. . . . I am not with the Jenrette Transport Company now."

On cross-examination this witness testified: "Right after this accident happened I knew more about it than I remember here this morning. On the 12th day of April 1949 I made a statement about it, a statement under oath. . . . I said, 'I was traveling highway #421 and had reached a point within the city limits of Greensboro.' Q. And I ask you if you didn't go

on and say, 'As I attempted to drive through an underpass the two top tanks struck the underside of the bridge, forcing them back against the other tanks, causing the tanks to break the sides of the trailer, letting the tanks roll onto the pavement,' you said that, didn't you? A. I did not put that on the paper but that was my opinion. . . . That was the statement I gave. Q. I'm asking you if that isn't what you said about it 5 days after it happened? A. I gave the statement. Q. You said that, what I just read, at the time, didn't you? A. Yes sir; from the way it looked after I got back there and examined the tanks it looked as though the two front tanks had struck it, and hit the underpass. Q. Then did you say in your statement, when you were telling about it, 'There were some angle irons in the front corner of the trailer that were used when hauling 1,000-gallon tanks. The irons were not being used on the load that I was hauling and in some way one of the irons fell to the floor and the bumps caused by the roadbed caused one of these irons to slip under the front tanks which raised the tanks enough to let them hit the bridge.' Didn't you say that? A. I couldn't tell. Q. You said that at the time, didn't you? A. That could have happened. I don't know because I didn't see that. Q. Now, at the time that you were making this statement and swore to it, didn't you also say, 'No part of the truck or trailer came into contact with the bridge either at the top or at the sides.'? A. No part of it did come in contact with the bridge. There was no sign of a tractor or trailer going to the side, being forced over on the right. I made the statement that no part of the truck or trailer came into contact with the bridge either at the top or at the sides."

The court then, over the objection of the defendant, permitted the plaintiff on redirect examination to cross-examine Hargis as a hostile witness. Numerous questions were propounded to him along the general line of the following: "Q. Well, Mr. Hargis, you said a while ago that of course you couldn't see what happened behind you on that truck? A. No sir, I couldn't. Q. You don't know what struck what do you? A. No sir. That was my opinion about it. . . . Q. You said and you say now that that was just an opinion, is that right? A. That's right, yes sir, I couldn't see back there. Q. You don't know what happened back there on the truck, do you? A. No sir; . . . Q. You don't know that the top of the tanks or the top tanks either one struck the bridge, do you? ·A. No sir; all I know is, something struck it. Q. You just know that something struck the bridge underpass. A. That's right. Q. And after the thing was over you found the side of the truck torn up and the tanks torn up? A. Yes sir, that's right. Q. What they struck and which one struck first and all that you just don't know, do you? A. No sir. . . . Q. And while you said your recollection was fresher at that time than it is now, when you wrote that, that something struck the bridge, that wasn't anything

you recalled, that was simply your opinion, wasn't it? A. Yes, that's right. When I seen the tanks, pulled over and looked it looked as if the top tanks had hit the bridge. Q. But you don't know that and that is simply your opinion? A. No, I don't know it. Q. That was simply your opinion then and is now? A. That's right. Q. In other words, you are just guessing about that, aren't you? A. Yes, sir."

On recross-examination, with respect to the statement which this witness signed on 12 April, 1949, he testified: "I made this statement to Mr. Love, who is sitting over here. He asked me to make a statement as to just how this thing happened, and I did it as near as I knew how. And in response to his questions to me and his request of me, I told him how it happened. Q. And he wrote it down and after it was written down you read it, said in the statement that you had read it over and that it was a correct statement? A. Yes sir, I sure did, the best I could. Then I swore to it before a Notary Public. . . . Q. And this morning, Mr. Simms asked you who showed you the statement and you said I showed it to you and I ask you if I didn't then ask you if it was correct, Mr. Hargis, this morning? A. Well, it is correct excepting that I couldn't swear to what caused the tanks to hit the underpassing."

This witness further testified that two of the four or five large tanks that were standing up in the front part of the trailer were bent close to the top; that he entered the underpass as near in the middle as possible and when he stopped he found the tanks all over the street and sidewalk; that he did not think the trailer was out of line with the tractor in any way.

The plaintiff's evidence further tends to show that the underpass is 15 feet 5 inches wide from curb to curb and 16 feet 1 inch wide from pier to pier. It is 12 feet 9½ inches high on the extreme right and 12 feet 8 inches high in the center, and 12 feet 6 inches high on the left. The bed of the truck was 4 feet 5 inches above the pavement and the large tanks were 8 feet long. The stakes on the sides of the truck were 5 feet high. Three sections of the body were broken or torn off. There was no damage to the platform of the trailer. The tanks were chained up and down the sides and across from side to side to hold them together to keep them from swaying. The chains went through and between the tanks from side to side and were tied to the sides of the trailer. The trailer is ordinarily just a platform, but around the edges or sides there are places in a steel band to put stakes in and there were chains laced back and forth making the tanks fast.

J. M. Jenrette, Sr., was permitted to testify, over the objection of the defendant, that about two weeks after this collision occurred he examined the underpass and found certain scarring on the right pier about 7 feet from the ground.

The defendant introduced in evidence the statement made by Hargis on 12 April, 1949, and renewed its motion for judgment as of nonsuit. The motion was denied and defendant excepted.

Issues were submitted to the jury and answered as follows:

"1. Was the loss or damage sustained by plaintiff caused by the truck colliding with the underpass?

"Answer: Yes.

"2. What amount is plaintiff entitled to recover?

"Answer: $557.25."

Upon the return of the verdict, the defendant moved to set it aside as to both issues. The motion was denied as to the first and allowed as to the second in the discretion of the court. A new trial was ordered on the second issue and the case was set for trial as the first contested case on 18 February, 1952. At the second trial, before Carr, J., the court submitted the issue as to what amount the plaintiff was entitled to recover of the defendant, and the jury answered: "$557.25 and six per cent interest dating retroactive to June 1, 1949." From the judgment entered, the defendant appeals assigning errors based on the exceptions taken in both trials.

*Simms & Simms and John M. Simms for plaintiff, appellee.*
*Murray Allen for defendant, appellant.*

DENNY, J. This appeal turns on whether or not the plaintiff offered more than a scintilla of evidence in the trial below in support of its allegation that plaintiff's truck and some of the tanks which were being transported, collided with the side of the underpass. If no part of the truck or trailer collided with the underpass, the plaintiff is not entitled to recover, irrespective of any damage that may have resulted from the tanks having collided therewith. *Cf. Electric Co. v. Insurance Co.,* 229 N.C. 518, 50 S.E. 2d 295, where the cargo insurance policy contained no exclusion clause such as that contained in the present contract.

The plaintiff is entitled to have the evidence considered in the light most favorable to it and to the benefit of every reasonable inference to be drawn therefrom. *Chambers v. Allen,* 233 N.C. 195, 63 S.E. 2d 212; *Carson v. Doggett,* 231 N.C. 629, 58 S.E. 2d 609; *Winfield v. Smith,* 230 N.C. 392, 53 S.E. 2d 251. But, when the evidence is so considered, it must do more than raise a suspicion, conjecture, guess, surmise, or speculation as to the pertinent facts in order to justify its submission to the jury. *Denny v. Snow,* 199 N.C. 773, 155 S.E. 874.

A verdict or finding must rest upon proven facts or upon facts of which there is substantial evidence. A verdict or finding in favor of one having the burden of proof will not be upheld if the evidence upon which it rests

raises no more than mere conjecture, guess, surmise, or speculation. "There must be legal evidence of every material fact necessary to support the verdict or finding, and such verdict or finding must be grounded on a reasonable certainty as to the probabilities arising from a fair consideration of the evidence, and not a mere guess, or on possibilities." 23 C.J., pp. 51-52; *S. v. Johnson,* 199 N.C. 429, 154 S.E. 730; *Denny v. Snow, supra; Broughton v. Oil Co.,* 201 N.C. 282, 159 S.E. 321; *Shuford v. Scruggs,* 201 N.C. 685, 161 S.E. 315; *Sutton v. Herrin,* 202 N.C. 599, 163 S.E. 578; *Plyler v. Country Club,* 214 N.C. 453, 199 S.E. 622; *Cummings v. R. R.,* 217 N.C. 127, 6 S.E. 2d 837; *Mercer v. Powell,* 218 N.C. 642, 12 S.E. 2d 227; *Mills v. Moore,* 219 N.C. 25, 12 S.E. 2d 661; *Mitchell v. Melts,* 220 N.C. 793, 18 S.E. 2d 406; *Lumber Co. v. Elizabeth City,* 227 N.C. 270, 41 S.E. 2d 761. As was said by the late *Chief Justice Stacy,* in *S. v. Johnson, supra:* "The general rule is that, if there be any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury. But as was said in the case where a darky was being prosecuted for the larceny of a pig, there must be more than the argument of the solicitor : 'Gentlemen of the jury, there was a hog. Here is a negro. Take the case.' *Wilson v. Lumber Co.,* 194 N.C. 374, 139 S.E. 760; *Moore v. R. R.,* 173 N.C. 311, 92 S.E. 1."

What is the evidence in this case to support the finding that the plaintiff's truck or trailer collided with the underpass?

The evidence of Mr. Jenrette to the effect that about two weeks after this collision he examined the underpass and found certain "scarring" on the right pier about 7 feet from the ground, has no probative value, and the defendant's objection to its admission should have been sustained.

The plaintiff must rely upon the testimony of its driver, Roy Hargis, and the reasonable inferences that may be drawn therefrom to sustain the verdict on the first issue, and when his testimony is so considered, if it is insufficient to sustain the verdict, the defendant's motion for judgment as of nonsuit must be allowed.

This witness testified that no part of the tractor or trailer came in contact with the bridge either at the top or at the sides. He also made a sworn statement to this effect to an agent of the defendant five days after the collision occurred, and repeated it two or three times in his oral testimony at the trial.

Counsel for plaintiff was permitted by the court not to impeach this witness but to cross-examine him on the ground that he was hostile. Pur· suant to this ruling, counsel tried diligently and with some success to get the witness to characterize his signed statement as well as his testimony about what occurred at the time of the collision as being merely his

opinion or a guess on his part. This added nothing by way of proof that plaintiff's truck or trailer came in contact with the underpass, but merely tended to raise a doubt as to what did cause the collision and thereby leave the ascertainment of the crucial facts in the case wholly to conjecture, surmise, or speculation. Even so, while being so examined, the witness said: "When I seen the tanks, pulled over and looked it looked as if the top tanks had hit the bridge." Moreover, he testified on cross-examination by defendant's counsel, that two of the four or five large tanks that were standing up in the front of the trailer were bent close to the top; that he entered the underpass as near in the middle as possible and when he stopped, the rear end of the trailer was still under the underpass; that at the time of the collision he was going only 12 or 15 miles an hour; that when he got off the truck, part of the stake-body of the trailer on his right-hand side had been broken off; that no part of the tractor or trailer came in contact with the bridge, and there was "no sign of a tractor or trailer going to the side, being forced over on the right." Furthermore, he testified that the sworn statement that he made and signed before a Notary Public on 12 April, 1949, was correct "excepting that I couldn't swear to what caused the tanks to hit the underpassing."

If, as this witness testified, no part of the truck or trailer came in contact with the underpass, and there seems to be no evidence to the contrary, unless it be by inference based on mere speculation or conjecture, it becomes immaterial whether the three stakes on the trailer were broken by the pressure of the tanks against them or by the pressure of the tanks against the chains by which they were held in place and tied to the sides of the trailer. In any event, the right-hand side of the platform of the trailer, including the steel band, or bands, which held the upright stakes in place, was not damaged.

The sworn statement referred to above was introduced in evidence by the defendants. However, in considering the motion for judgment as of nonsuit renewed at the close of the entire evidence, the evidence of the defendant which is not in conflict with the evidence of the plaintiff, may be used to explain or make clear what has been offered by the plaintiff. "This was the purpose of the Legislature in providing that such motion might be renewed at the conclusion of all the evidence." *S. v. Fulcher,* 184 N.C. 663, 113 S.E. 769; *Hare v. Weil,* 213 N.C. 484, 196 S.E. 869.

The evidence adduced in the trial below, in our opinion, is insufficient to support the verdict. The motion for judgment as of nonsuit should have been allowed.

Reversed.

PARKER, J., took no part in the consideration or decision of this case.