IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-629

Filed 20 August 2024

Person County, No. 18 CVS 650

ESTATE OF MELVIN JOSEPH LONG, by and through MARLA HUDSON LONG, Administratrix, Plaintiff,

v.

JAMES D. FOWLER, individually, DAVID A. MATTHEWS, individually, and DENNIS F. KINSLER, individually, Defendants.

Appeal by Plaintiff from order entered 25 January 2023 by Judge John M. Dunlow in Person County Superior Court. Heard in the Court of Appeals 29 November 2023.

> *Sanford Thompson, PLLC, by Sanford W. Thompson IV, and Hardison & Cochran, PLLC, by Timothy M. Lyons and John Paul Godwin, for Plaintiff-Appellant.*

> *Parker Poe Adams & Bernstein, LLP, by Jonathan E. Hall and Patrick M. Meacham, for Defendants-Appellees.*

GRIFFIN, Judge.

Plaintiff appeals from an order granting Defendants' Motion for Summary Judgment. Plaintiff contends the trial court erred by entering summary judgment because there are genuine issues of material fact as to whether the accident underlying the cause of action was foreseeable and as to whether the decedent was contributorily negligent. We affirm the trial court's order granting summary

judgment.

## I. Factual and Procedural Background

Defendants are North Carolina State University employees who are responsible for performing a variety of maintenance tasks on N.C. State's campus. Plaintiff is the Administratrix of her deceased husband's estate. Prior to his death, Decedent was an OSHA-certified pipefitter employed by Quate Industrial Services, an industrial equipment contractor that worked on piping, boilers, chillers, and pressure vessels.

Decedent worked at QSI intermittently for twenty years. Decedent was QSI's site supervisor for the project and was responsible for day-to-day safety on site. Decedent's safety training while employed by QSI included a thirty-hour OSHA class as well as extensive third-party training provided through his employer. This training included instructions to double-check pressures valves, to not stand in front of caps while removing them, and to independently verify mechanisms and safeguards prior to beginning work on equipment that others have performed work on.

Defendant Dennis Kinsler was an "HVAC Advanced Technician" and employed by NCSU from 2012 to 2017. Kinsler worked on the water side of HVAC machines for NCSU in December 2016 and January 2017. Defendant James Fowler took HVAC courses at a community college in 1990 and 2000 and worked with several companies doing HVAC service and repair after 1990. Fowler began work as an "HVAC

Mechanic" at NCSU in 2014. Defendant David Matthews was a "Field Maintenance Technician" who worked on HVAC equipment and supporting HVAC technicians.

In 2016, NCSU began a construction project at the Monteith Research Center on its Centennial Campus. NCSU contracted with Thalle Construction Company to provide related services. Thalle, in turn, subcontracted with QSI, Decedent's employer. As part of the project, QSI was responsible for moving a large mobile chiller attached to a tractor-trailer located outside of the MRC a few feet. The chiller has two cooling circuits, each of which has a chiller barrel containing water cooler tubes and high-pressure refrigerant. Water passes through the chiller barrels inside copper tubes, and the water is cooled by refrigerant outside the tubes. Several warning labels related to the use and maintenance of the chiller are attached to its exterior. One of the labels represented it was not possible to completely drain all the water from the chiller and directed that workers put five gallons of antifreeze into the chiller when shutting it down for winter. NCSU kept the manual to the chiller in one of its workshops on Centennial Campus.

On 19 December 2016, an NCSU supervisor, pursuant to a service request placed by QSI, issued a work order instructing employees to "PLEASE DRAIN AND SECURE CARRIER CHILLER FOR RELOCATION." Defendants Fowler and Matthews were assigned to drain the water from the chiller. Defendant Kinsler instructed them to undertake several specific steps, including performing a "nitrogen purge" to blow nitrogen through the water piping. Defendant Kinsler admittedly did

not read the chiller's manual prior to entering the assignment. On 21 December 2016, Defendants Fowler and Matthews drained the chiller until the flow of water became a trickle. They then performed the nitrogen purge.

On 3 January 2017, Defendants Fowler and Matthew secured the chiller by attaching metal caps and flanges over the inlet and outlet pipes. Between 3 January 2017 and 20 January 2017, temperatures in Raleigh fell below freezing causing water in the chiller's pipes to freeze and expand. The expanding water burst the pipes, allowing high-pressure refrigerant to escape into the water system causing the chiller to become pressurized.

On 20 January 2017, Decedent and another QSI employee, Nate Weston, were assigned to remove the caps and flanges from the chiller. Prior to beginning their work, Decedent and Weston checked the chiller's pressure gauges located at various points on the exterior of the chiller, all of which read zero. However, they did not check the bleed valve on top of the chiller. The chiller was not connected to water or electricity at this point and, because the pressure gauges also read zero, they assumed the system was not pressurized. Decedent and Weston began removing one of the thirteen-pound caps from the chiller's suction line by loosening a nut on the side of the flange. There was no indication, such as the smell or sound of gas escaping from the cap, that the chiller was pressurized. Decedent proceeded to use a socket wrench on the flange when the cap flew off and stuck him in the face and head. Emergency Medical Technicians transported Decedent to WakeMed where he was treated for his

injuries. While at WakeMed, Decedent's blood tested positive for marijuana. Five days later, Decedent passed away from his injuries.

On 13 November 2018, Plaintiff filed a wrongful death lawsuit in Person County Superior Court. On 3 May 2019, the trial court entered an order granting Defendants' Motion to Dismiss because sovereign immunity barred claims against public employees sued in their individual capacities. Plaintiff appealed to this Court from that order. On appeal, we reversed the trial court's order holding Plaintiff's complaint sufficiently alleged claims for negligence and punitive damages and that sovereign immunity did not bar Plaintiff's claim. *Long v. Fowler*, 270 N.C. App. 241, 245–53, 841 S.E.2d 290, 293–300 (2020). Defendants then appealed to the North Carolina Supreme Court, which affirmed this Court's decision and remanded the case to Person County Superior Court. *Long v. Fowler*, 378 N.C. 138, 142–55, 861 S.E.2d 686, 691–98 (2021).

On remand, the parties conducted discovery over the course of sixteen months. During discovery, depositions were taken of each Defendant, Rusty Quate, Nate Weston, and experts from both sides, and documentation related to warning labels on the chiller and provisions of the chiller manual were produced.

On 26 December 2022, Defendants filed a Motion for Summary Judgment under Rule 56 of the North Carolina Rules of Civil Procedure. On 5 January 2023, the Motion came on for hearing. On 25 January 2023, the trial court entered an order granting Defendants' Motion for Summary Judgment. Plaintiff timely appealed.

## II.    Analysis

Plaintiff argues the trial court erred in granting Defendant's Motion for Summary Judgment because there are genuine issues of material fact as to whether Defendants proximately caused Decedent's death and as to whether Decedent was contributorily negligent.

An order granting summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." *Crazie Overstock Promotions, LLC v. State*, 377 N.C. 391, 401, 858 S.E.2d 581, 588 (2021) (citation and internal marks omitted); *see also* N.C. R. Civ. P. 56(c).

> While summary judgment is rarely appropriate in cases involving negligence and contributory negligence, summary judgment is appropriate in such cases when the moving party carries his initial burden of showing the nonexistence of an element essential to the other party's case and the non-moving party then fails to produce or forecast at hearing any ability to produce at trial evidence of such essential element of his claims.

*Terry v. Pub. Serv. Co. of N.C.*, 385 N.C. 797, 801, 898 S.E.2d 648, 651 (2024) (citations and internal marks omitted).  To this point, summary judgment should be granted in cases where "only questions of law are involved and a fatal weakness in the claim of a party is exposed." *Estate of Graham v. Lambert*, 385 N.C. 644, 650–51, 898 S.E.2d 888, 895 (2024) (citation and internal marks omitted).  Moreover, where a party

"presents an argument or defense supported by facts which would entitle him to judgment as a matter of law, the party opposing the motion must present a forecast of the evidence which will be available for presentation at trial and which will tend to support his claim for relief." *Cone v. Cone*, 50 N.C. App. 343, 347, 274 S.E.2d 341, 343–44 (1981) (citation and internal marks omitted).

We review an order granting summary judgment de novo. *Bryan v. Kittinger*, 282 N.C. App. 435, 437, 871 S.E.2d 560, 562 (2022) (citation omitted). Under de novo review, we "consider[] the matter anew and freely substitutes [our] own judgment for that of the lower court[]." *N.C. Farm Bureau Mut. Ins. Co. v. Herring*, 385 N.C. 419, 422, 894 S.E.2d 709, 712 (2023) (citation and internal marks omitted).

## A. Proximate Cause

Plaintiff argues the trial court erred by granting Defendants' Motion for Summary Judgment because there exists genuine issues of material fact about whether the accident resulting in Decedent's death was proximately caused by Defendants' conduct. Specifically, Plaintiff contends that because the chiller's manual specifically warned of system pressures that could result from failing to use antifreeze, and the accident resulted from system pressure, Defendants were negligent by failing to read the manual and by failing to use antifreeze when shutting the chiller down. Because the manual only warns of potential damage to the chiller itself, and not of injury to persons resulting from system pressures, we disagree that the injury caused was reasonably foreseeable.

To prevail on a claim of negligence, a "plaintiff must show that: (1) the defendant [or defendants] failed to exercise due care in the performance of some legal duty owed to the plaintiff under the circumstances; and (2) the negligent breach of such duty was the proximate cause of the injury." *Cedarbrook Residential Ctr., Inc. v. N.C. Dep't. of Health and Hum. Servs.*, 383 N.C. 31, 61, 881 S.E.2d 558, 580 (2022) (quoting *Bolkhir v. N.C. State Univ.*, 321 N.C. 706, 709, 365 S.E.2d 898, 900 (1988)) (cleaned up). Proximate cause is defined as

> a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from *which a person of ordinary prudence could have reasonably foreseen* that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

*Williamson v. Liptzin*, 141 N.C. App. 1, 10, 539 S.E.2d 313, 319 (2000) (citing *Hairston v. Alexander Tank and Equip. Co.*, 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984)) (emphasis added).

"Foreseeability of injury is an essential question of proximate cause." *McNair v. Boyette*, 282 N.C. 230, 236, 192 S.E.2d 457, 461 (1972) (citation omitted). Thus, to establish proximate cause, "a plaintiff is required to prove that in the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected." *Williamson*, 141 N.C. App. at 10, 539 S.E.2d at 319 (citation and internal marks omitted). However, the law of negligence "requires only

reasonable prevision. A defendant is not required to foresee events which are merely possible but only those which are reasonably foreseeable." *Hairston*, 310 N.C. at 234, 311 S.E.2d at 565 (citing *Bennett v. Southern Ry. Co.*, 245 N.C. 261, 270–71, 96 S.E.2d 31, 38 (1957)). To this end, "[t]he law does not charge a person with all the possible consequences of his negligence," but rather recognizes that "[a] man's responsibility for his negligence must end somewhere." *Phelps v. City of Winston-Salem*, 272 N.C. 24, 30, 157 S.E.2d 719, 723 (1967). Specifically, a party's responsibility for their negligent acts ends where "the connection between negligence and the injury appears unnatural, unreasonable and improbable[.]" *Id.*

Here, the record contains uncontested facts showing that it was not reasonably foreseeable that Defendants failing to put antifreeze in the chiller would result in catastrophic injury to Decedent. Rather, the resulting injury came about from an improbable chain of events that industry veterans had never seen before.

At the outset, it is noteworthy that the chiller was not energized, meaning it was not connected to electricity or water, and, therefore, according to the accident report prepared the day of, "it should have been impossible for it to contain pressure[.]" However, the chiller became pressurized by a chemical reaction occurring while the chiller was deenergized. Nonetheless, Decedent's employer and coworkers, as well as Plaintiff's expert, testified an accident of this nature was completely unexpected.

At his deposition, Marshall Quate, Decedent's employer and twenty-four-year

veteran of the HVAC industry, represented that QSI had never worked "on a jobsite where [] a chiller unit was drained and antifreeze was added to it." In fact, despite having knowledge of the freezing temperatures and caps on the chiller, Marshall Quate did not consider pressurization to be a possibility and had never heard of an accident like this happening before. He testified that he could "not understand how [the accident] could happen."

QSI's other employee present that day, Nathan Weston, drafted an accident report characterizing the accident as resulting from "unexpected pressure." This characterization was based upon twenty-eight years of experience in pipefitting where he had never "heard of a disconnected, deenergized cooler actually being pressurized after sitting three to four weeks without a connection[.]" To that point, Nathan Weston had "no clue" what caused the chiller to become pressurized and testified,

> Q: . . . In all your experience, all your years working around chillers, have you ever heard of a situation where there was water left in a chiller unit, and it caused freezing of the pipes or freezing of the refrigerant tubes to the point that they cracked or leaked?
>
> A: I have not heard of it. No. But this is probably the only time I've ever heard of one even blowing up like this. I've never heard of it anywhere.

Another QSI pipefitter and Mr. Weston's brother, Danny Weston, had never heard of antifreeze leaking into a pipe.

Plaintiff cites the deposition testimony of Defendants Fowler and Matthews to

show they understood the sequence of events leading to the accident, and this understanding therefore makes the accident foreseeable. However, Defendant Fowler initially explains his understanding of the sequence in terms of causing damage to the chiller, not in terms of causing a fatal injury. Specifically, Defendant Fowler represented that the purpose of adding antifreeze to the chiller was "to protect the machine," and intended "to prevent the tubes from freezing and being damaged," not to prevent an accident of the type which occurred. Defendant Matthews, on the other hand, stated he did not know whether the series of events led to the cap hitting Decedent in the head. Instead, he agreed only with bare assertions of fact reflecting the sequence of events; not whether the outcome was foreseeable. Moreover, Defendant Matthews stated he had "very limited knowledge" about how the chiller worked.

Defendant Fowler's testimony exemplifies and contradicts a point Plaintiff contends warrants the reversal of summary judgment. Specifically, Plaintiff contends Defendants' failure to read the chiller's manual and warning labels could constitute actionable negligence and therefore warrants submission of the case to a jury. This is incorrect. Even assuming Defendants read the manual prior to commencing their work, the manual and labels only warned of damage to the chiller if it became pressurized, not of danger to those working on it. Thus, even if Defendants read the manual, they would not have notice that failing to add antifreeze to the chiller during winter shutdown could result in a condition hazardous to the

safety of those working on it.

This is not to say the manual does not warn of *other* hazards created by the chiller. Rather, the chiller's manual frequently cites electrical shock as a potential cause of injury. Of relevance here, there is a black box titled "CAUTION" that states: "Electrical shock can cause personal injury. Disconnect all electrical power before servicing." In contrast, the section immediately following the warning, entitled "Winter Shutdown Preparation," does not contain any sort of indication that failure to use refrigerant may cause personal injury. Rather, the section warns about possible injury occurring while *draining* the chiller. The manual also warns about various points in the maintenance process where there is a risk of injury but does not specify failure to use refrigerant as one of these instances.

Alongside the manual, the labels attached directly to the chiller did not warn of the potential for injury to persons. One such label stated "**FREEZE WARNING!** It is <u>not</u> possible to drain <u>all</u> water from this heat exchanger! For freeze protection during shutdown, exchanger must be drained and refilled with 5 gals Glycol min. **TRAPPED WATER!**" Neither the manual nor the attached labels provide notice to technicians working on the chiller that failure to use refrigerant could potentially cause bodily harm to technicians servicing the chiller; much less those moving it.

Plaintiff's expert deposition summarizes the foreseeability of this accident:

> Q:    And nowhere in the manual does it state that a failure to properly winterize the machine or add antifreeze, properly drain it, fully drain it, nowhere does it say that

may present a hazard to humans, true?

A:    It does not specify hazard to humans in that verbiage.

Q:    It never talks about it being a safety concern, does it?

A:    It discusses it as a damage to the unit, correct.

Q:    And, again, so it does not discuss it as being a safety concern - -

A:    Not as a safety concern.

Ultimately, the undisputed facts show the accident resulting in Decedent's death was, as the depositions, expert testimony, and after-accident report reflects, the result of *unexpected* pressure and therefore not foreseeable. Being so, the law cannot hold Defendants responsible where "the connection between negligence and the injury appears unnatural, unreasonable and improbable[.]" *Phelps*, 272 N.C. at 30, 157 S.E.2d at 723. Resultingly, the trial court properly granted summary judgment for Defendants because the uncontested facts show the accident was an unforeseeable result of Defendants' failure to use antifreeze, and thus Defendants' conduct could not be the proximate cause of Decedent's death.

**B. Contributory Negligence**

Even assuming arguendo that there is a genuine issue of material fact as to whether Decedent's injury was reasonably foreseeable, Decedent's contributory negligence is sufficient to warrant summary judgment and bar recovery.

Under North Carolina law, every person has a duty "to take reasonable care to

not harm others and a corresponding duty . . . to take reasonable care to not harm oneself." *Draughon v. Evening Star Holiness Church of Dunn*, 374 N.C. 479, 480, 843 S.E.2d 72, 74 (2020). In recognition of the latter duty, "a plaintiff cannot recover for injuries resulting from a defendant's negligence if the plaintiff's own negligence contributed to his injury." *Id.* at 483, 843 S.E.2d at 76 (citation and internal marks omitted). "To establish contributory negligence, the defendant must demonstrate: (1) a want of due care on the part of the plaintiff; and (2) a proximate connection between the plaintiff's negligence and the injury." *Shelton v. Steelcase, Inc.*, 197 N.C. App. 404, 424, 677 S.E.2d 485, 499 (2009) (citations and internal marks omitted). Whether a plaintiff was contributorily negligent "does not depend on [the] plaintiff's subjective appreciation of danger; rather, contributory negligence consists of conduct which fails to conform to an *objective standard of behavior*, such care as an ordinarily prudent person would exercise under the same or similar circumstances to avoid injury." *Smith v. Fiber Controls Corp.*, 300 N.C. 669, 673, 268 S.E.2d 504, 507 (1980) (citation and internal marks omitted) (emphasis added). When a plaintiff "possesses the capacity to understand and avoid a known danger and fails to take advantage of that opportunity, and is injured as a result, [they] are charged with contributory negligence." *Moseley v. Hendricks*, ___ N.C. App. ___, ___, 897 S.E.2d 680, 684 (2024) (citing *Proffitt v. Gosnell*, 257 N.C. App. 148, 152–53, 809 S.E.2d 200, 204 (2017)).

Here, Decedent, as a matter of law, failed to conform his conduct to that of a reasonably prudent person in the same circumstances. QSI required Decedent to

attend extensive safety training that, if heeded, would have ensured his safety. One fact of initial importance is that Decedent and his coworker discussed the possibility that the chiller could be pressurized, thus showing Decedent "possesse[d] the capacity to understand . . . a known danger." *Hendricks*, ___ N.C. App. at ___, 897 S.E.2d at 684. Unlike Defendants, Decedent should have reasonably foreseen the danger presented by the chiller's potential pressurization because of his extensive safety training and his employer's safety procedures which reinforced his training.

For example, Decedent's training included instruction to stand to the side of a cap when removing it from a pipe for the purpose of mitigating any unexpected risk presented by the cap. Rusty Quate stated that Decedent had received training to this effect on multiple occasions. Defendants' expert opined that a pre-task safety plan, which was within the scope of Decedent's responsibilities, would have included this measure as well. Thus, Decedent not only possessed the capacity to understand the possibility of an unforeseeable danger, but also the training on how to avoid potential unforeseen circumstances that could present danger.

In anticipation of unexpected hazards, OSHA and QSI safety training disavowed relying on others' work when verifying the safety of pressurized systems. However, Decedent and his coworker, on the day of the accident, "assumed [the chiller was] completely deenergized," as it was "locked out, [and] tagged out." So, they "figured [they were] good to go." This assumption was incorrect. Rather than incorrectly assuming the system was depressurized, Decedent could have checked the

bleed off valve located next to one of the pressure gauges on top of the chiller. Doing so, according to Plaintiff's expert, would not only have alerted Decedent to the chiller's pressurization but also allowed the pressure to be relieved, thereby preventing the cap from flying off and injuring Decedent. QSI trained Decedent to check for pressurization via valve even when a system's pressure gauges read zero. In failing to do so, Decedent's actions contradicted his training which he was given for the purpose of preventing unexpected accidents.

As Plaintiff's expert summarized the unexpected nature of Decedent's injury, QSI's owner summarized Decedent's contributory negligence:

> Q:     Okay. So by its very definition, even if you think a system is depressurized, you train people, "Don't trust it. Keep your head out of the way. Don't stand in front of a cap when you're taking it off." Is that true?
>
> A:     That's true.
>
> Q      And even if you think a system is depressurized, if you have something like a bleed valve that you can check to be sure, you should use it, true?
>
> A:     True.

Decedent failed to take these measures to ensure his own safety, despite his training to do so, showing his contributory negligence. Plaintiff failed to forecast evidence to the contrary. Defendants have carried their burden of showing, based on the uncontested facts, Decedent's contributory negligence. As "a plaintiff cannot recover for injuries resulting from a defendant's negligence if the [decedent]'s own

negligence contributed to his injury[,]" *Draughon,* 374 N.C. at 483, 843 S.E.2d at 76 (citation omitted), the trial court properly entered summary judgment for Defendants.

## III.    Conclusion

For the aforementioned reasons, we hold the trial court did not err by granting Defendants' Motion for Summary Judgment.

AFFIRMED.

Judge ARROWOOD concurs.

Judge HAMPSON dissents by separate opinion.

No. COA23-629 – *Long v. Fowler*

HAMPSON, Judge, dissenting.

### Factual and Procedural Background

The Estate of Marvin Joseph Long (Decedent), by and through Marla Hudson Long as Administratrix (Plaintiff), appeals from an Order on Summary Judgment entered 25 January 2023 which granted Summary Judgment in favor of James D. Fowler (Fowler), David A. Matthews (Matthews), and Dennis F. Kinsler (Kinsler) (collectively, Defendants). The Record before us tends to reflect the following:

Defendants in this case are all employees of North Carolina State University (NCSU). Kinsler was an "HVAC Advanced Technician" and at NCSU from 2012 to 2017. In December 2016 and January 2017, Kinsler worked for NCSU, including on the water side of HVAC machines. Fowler took HVAC courses at a community college in 1990 and 2000, and he worked with several companies doing HVAC service and repair after 1990. He began work as an "HVAC Mechanic" at NCSU in 2014. Matthews was a "Field Maintenance Technician" working on HVAC equipment and supporting HVAC technicians.

The Carrier Chiller (Chiller) is a mobile chiller unit, which was placed at the rear of the Monteith Research Center (MRC) at NCSU. The Chiller has two cooling circuits, each of which has a chiller barrel inside of which are water cooler tubes and high-pressure refrigerant. Water passes through the chiller barrels inside copper tubes, and the water is cooled by refrigerant outside the tubes. When the Chiller was not operating, the refrigerant in the chiller barrels was under more pressure than the

water tubes in the barrels; thus, the refrigerant would go into the water piping system if there were leaks or cracks in the walls of the water tubes.

As part of a construction project, contractors had to move the Chiller approximately ten feet from its original location. Quate Industrial Services (Quate) was a subcontractor on the NCSU construction project and employed Decedent. Quate placed a service request with NCSU's Facilities Maintenance Department to "drain and secure" the Chiller so it could be relocated. On 19 December 2016, an NCSU supervisor issued a work order, which instructed employees to "PLEASE DRAIN AND SECURE CARRIER CHILLER FOR RELOCATION." Fowler and Matthews were assigned to drain the water from the Chiller. Kinsler instructed them to undertake several specific steps, including performing a "nitrogen purge" to blow nitrogen through the water piping. Kinsler testified he had never looked at the Chiller manual. Matthews had done preventative maintenance on the Chiller prior to the incident in this case and had worked with an AC mechanic when refrigerant was installed.

On 21 December 2016, Fowler and Matthews drained the Chiller by opening a valve at its base and allowing the water to drain until the unit appeared empty. They then used a cannister of compressed nitrogen to attempt to "push [the water], get [the water] out of the machine and dry the tubes . . . [s]o it doesn't freeze up." Fowler testified he knew if there was water left in the Chiller, it could freeze and break the tubes. The Winter Shutdown Preparation section of the Chiller manual and warning

labels on the Chiller instructed antifreeze be used when shutting down the machine in the winter. However, Defendants did not put any antifreeze in the Chiller. Fowler and Matthews then "secured" the Chiller by attaching metal caps and flanges over the Chiller's inlet and outlet pipes on 3 January 2017. The caps weighed approximately thirteen pounds each.

Between 3 January 2017, when the caps were installed, and 20 January 2017, the date of the underlying incident, the Chiller remained outside near the MRC. Decedent was an employee of Quate and a pipefitter. He had training on safety procedures and was reportedly familiar with piping around chiller units generally. Defendants did not tell any Quate employee they had not filled the cooler tubes with antifreeze. Quate was not responsible for shutting down the Chiller, nor were its employees trained to operate the Chiller. On 20 January 2017, Decedent and another Quate employee, Nate Weston, began to take the caps off the inlet and outlet pipes. The Chiller was not attached to electricity or water and was not running. Decedent and Weston walked around the Chiller to inspect it. They examined the pressure gauges on the water lines and the gauges read "zero."

When they began to loosen the flange to take the cap off of one suction line, Decedent loosened a nut on the right side of the flange "a couple of turns[.]" When the nut was loosened, Weston did not hear any sound of air escaping or smell any odor. Rusty Quate, Decedent's supervisor, testified at his deposition this would indicate there was no pressure in the line, and it was safe to continue to remove the

cap.  Decedent and Weston continued to remove the cap.  Decedent started to use a socket wrench when the cap exploded out suddenly and struck him.  Decedent died as a result of his injuries five days later.

After this incident, an Eddy Current Tube Analysis performed on the water tubes in the two chiller barrels revealed water tubes in the lower path of each chiller barrel were broken due to freeze damage.  Defendants' expert testified water left in the Chiller when it was drained would collect in the lower tubes, and it was "very likely" when the water froze, the resulting ice expanded and ruptured the tubes, causing the damage shown by the Eddy Current Test.  Weather records showed sub-freezing temperatures between 7 and 10 January 2017—after the caps had been installed on the Chiller pipes.  Defendants' expert testified if any refrigerant had gotten into the water system as a result of damage to the tubes, this would have resulted in system pressure.

On 13 November 2018, Plaintiff filed a wrongful death lawsuit in Person County Superior Court.  The Complaint alleged Decedent's death was caused by the negligence of six NCSU maintenance employees, who were sued in their individual capacities.  Defendants filed a motion to dismiss under Rules 12(b)(1), (2), and (6) of the North Carolina Rules of Appellate Procedure.  The trial court entered an order granting Defendants' motion to dismiss on 3 May 2019.  Plaintiff appealed, and a panel of this Court reversed the dismissal, holding sovereign immunity did not bar claims against public employees sued in their individual capacities and the

Complaint sufficiently alleged claims for negligence and punitive damages. *Long v. Fowler*, 270 N.C. App. 241, 245-53, 841 S.E.2d 290, 293-300 (2020). Defendants then appealed to the North Carolina Supreme Court, which affirmed this Court's decision and remanded the case to Person County Superior Court. *Long v. Fowler*, 378 N.C. 138, 142-55, 861 S.E.2d 686, 691-98 (2021).

On remand, the parties proceeded with discovery over the course of sixteen months. During discovery, depositions were taken of each Defendant, Rusty Quate, Weston, and experts from both sides, and documentation related to warning labels on the Chiller and provisions of the Chiller manual was produced.

On 26 December 2022, Defendants filed a Motion for Summary Judgment under Rule 56 of the North Carolina Rules of Civil Procedure. Prior to the summary judgment hearing, Plaintiff voluntarily dismissed without prejudice the punitive damage claim and the negligence claims against three defendants. The trial court heard arguments on the Motion for Summary Judgment on 5 January 2023. On 25 January 2023, the trial court entered an Order on Summary Judgment granting Defendants' Motion. Plaintiff timely filed Notice of Appeal on 21 February 2023.

## Issues

The issues on appeal are whether the trial court erred by granting Defendant's Motion for Summary Judgment on the basis of (I) foreseeability of the injury to Decedent from Defendants' alleged negligence; and (II) contributory negligence on the part of Decedent.

## Analysis

We review a trial court's summary judgment order de novo. *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008). Under de novo review, "the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (citation and quotation marks omitted). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2021) (emphasis added). "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the non-moving party." *Jones*, 362 N.C. at 573, 669 S.E.2d at 576 (citation and quotation marks omitted). "The party moving for summary judgment has the burden of establishing the lack of any triable issue of fact." *Kidd v. Early*, 289 N.C. 343, 352, 222 S.E.2d 392, 399 (1976). All inferences are resolved against the moving party. *Id.*

"[S]ummary judgment is proper where the evidence fails to establish negligence on the part of defendant[.]" *Gardner v. Gardner*, 334 N.C. 662, 665, 435 S.E.2d 324, 327 (1993) (alterations, citations, and quotation marks omitted). Further,

> To survive a motion for summary judgment, plaintiff must have established a prima facie case of negligence by showing: (1) defendant failed to exercise proper care in the performance of a

6

duty owed to plaintiff; (2) the negligent breach of that duty was a proximate cause of plaintiff's injury; and (3) a person of ordinary prudence should have foreseen that plaintiff's injury was probable under the circumstances as they existed.

*Finely Forest Condominium Ass'n v. Perry*, 163 N.C. App. 735, 739, 594 S.E.2d 227, 230 (2004) (citation and quotation marks omitted).

Summary judgment generally is a "drastic remedy" that should be used with caution. *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971). "This is especially true in a negligence case in which a jury ordinarily applies the reasonable person standard to the facts of each case." *Williams v. Carolina Power & Light Co.*, 296 N.C. 400, 402, 250 S.E.2d 255, 257 (1979) (citing *Page v. Sloan*, 281 N.C. 697, 706, 190 S.E.2d 189, 194 (1972)). Thus, "[w]hile our Rule 56 . . . is available in all types of litigation to both plaintiff and defendant, 'we start with the general proposition that issues of negligence . . . are ordinarily not susceptible to summary adjudication . . . but should be resolved by trial in the ordinary manner.' " *Page*, 281 N.C. at 706, 190 S.E.2d at 194. Consequently, in *Wilson Brothers v. Mobil Oil*, this Court held there is a presumption against summary judgment in negligence cases. 63 N.C. App. 334, 338, 305 S.E.2d 40, 43 (1983), *cert. denied*, 309 N.C. 634, 308 S.E.2d 718 (1983).

The majority incorrectly characterizes Defendants' evidence as "uncontested". In my view, Plaintiff's evidence, as well as contradictory statements by Defendants themselves, clearly create a genuine issue of material fact. To be clear, the amount

of evidence on each side is of no matter in evaluating a motion for summary judgment so long as there is *some* evidence on each side. If so, summary judgment is properly denied so that the case may be submitted to a jury to assess the evidence's weight and credibility. *See Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 224, 513 S.E.2d 320, 327 (1999) ("Before summary judgment may be entered, it must be *clearly established* by the record before the trial court that there is a lack of *any* triable issue of fact." (quoting *Creech v. Melnik*, 347 N.C. 520, 526, 495 S.E.2d 907, 911 (1998))).

I.    Foreseeability

Plaintiff first contends the trial court erred in granting Summary Judgment for Defendants on the basis Decedent's injury was not a reasonably foreseeable result of Defendants' failure to put anti-freeze into the Chiller's barrels.

"Foreseeability of some injurious consequence of one's act is an essential element of proximate cause[.]" *Hastings for Pratt v. Seegars Fence Co.*, 128 N.C. App. 166, 170, 493 S.E.2d 782, 785 (1997) (citing *Sutton v. Duke*, 277 N.C. 94, 107, 176 S.E.2d 161, 169 (1970)). "Issues of proximate cause and foreseeability, involving application of standards of conduct, are ordinarily best left for resolution by a jury under appropriate instructions from the court." *Id.* Further, this Court has stated

> [I]t is *only in exceptional cases*, in which reasonable minds cannot differ as to foreseeability of injury, that a court should decide proximate cause as a matter of law. *[P]roximate cause is ordinarily a question of fact for the jury*, to be solved by the exercise of good common sense in the consideration of the

evidence of each particular case.

*Poage v. Cox*, 265 N.C. App. 229, 245, 828 S.E.2d 536, 546 (2019) (quoting *Williams*, 296 N.C. at 403, 250 S.E.2d at 258) (emphasis in original). Defendants contend Plaintiff cannot establish any genuine issue of material fact to show foreseeability. Defendants argue first the warning labels and the Chiller's manual provisions mentioned only potential damage to the machine, but they did not mention the possibility of inadvertent pressurization nor the creation of a potential hazard. Thus, in Defendants' view, the labels and manual are irrelevant. *See Burns v. Forsyth Cnty. Hosp. Auth.*, 81 N.C. App. 556, 562-63, 344 S.E.2d 839, 844-45 (1986). In opposing Defendants' Motion for Summary Judgment, however, Plaintiff presented evidence showing the first page of the Carrier manual specifically warned: "Installing, starting up, and servicing this equipment can be hazardous due to system pressures[.]" The Manual also instructs all those working on the Chiller to "observe precautions in the literature, and on tags, stickers, and labels attached to the equipment, and *any other safety precautions* that apply." These warnings may reasonably be interpreted as relating to potential dangers to persons working on the machine and the potential for pressurization.

Additionally, contrary to Defendants' assertions, a jury could reasonably conclude the system pressure hazard was foreseeable even though the Manual does not state the exact means by which the system became pressurized in this case. "The test of proximate cause is whether the risk of injury, *not necessarily in the precise*

9

*form in which it actually occurs*, is within the reasonable foresight of the defendant." *Williams*, 296 N.C. at 403, 250 S.E.2d at 258 (citations omitted) (emphasis added). Thus, Plaintiff need not establish the exact chain of events was reasonably foreseeable in order to recover. Rather, "[i]t is sufficient if by the exercise of reasonable care the defendant might have foreseen that some injury would result from his conduct or that consequences of a generally injurious nature might have been expected." *Slaughter v. Slaughter*, 264 N.C. 732, 735, 142 S.E.2d 683, 686 (1965). Given the warnings above, a jury could conclude Defendants should have foreseen the risk of injury resulting from pressurization of the Chiller.

Defendants also contend their training and experience was insufficient to put them on notice of a reasonable likelihood of injury if they failed to add antifreeze to the system. Defendants point to portions of their depositions and affidavits stating none of them had ever heard of this occurrence happening, they were unaware the Chiller had any residual water after they had drained it, and they did not know failing to completely drain the Chiller and add antifreeze could lead to injury.

Plaintiff put forward evidence of Defendants performing a "nitrogen purge" to attempt to blow out remaining water from the tubes and contends this shows Defendants appreciated the danger of leaving water behind in the tubes.

> [Plaintiff's Counsel]: And what made you think that you should use nitrogen if you were going to drain the water out?
>
> [Fowler]: Just to help push it, get it out of the machine and dry the tubes.

[Plaintiff's Counsel]: And why would you want to dry the tubes?

[Fowler]: So there's no water there.

[Plaintiff's Counsel]: And why would you want there to be no water in there?

[Fowler]: So it doesn't freeze up.

[Plaintiff's Counsel]: Why would you care whether the water froze up in the tubes?

[Fowler]: Well, you don't want them—you don't want to bust them.

Fowler also stated in his deposition he was familiar with refrigerants and knew they could pressurize the machine if the tubes were damaged. He further testified to his comprehension of the chain of events leading to Decedent's injury:

[Plaintiff's Counsel]: Okay. And were there ever—did you ever have occasion where you were using refrigerant, and something wasn't screwed on tight, or the threads didn't get quite right, and it would pop the—pop something loose?

[Defendants' Counsel]: Objection to form.

[Fowler]: A couple times.

[Plaintiff's Counsel]: Yeah. So the pressurized gas would be pressurized, and it could expel through an opening with force; is that right?

[Fowler]: Right.

[Plaintiff's Counsel]: All right. I said that with a lot of vulgar words, but if you've got pressurized gas, and it gets out, it can blow a coupling loose or knock something out; right?

[Fowler]: It comes out with pretty good force.

[Plaintiff's Counsel]: It comes out with good force.

[Fowler]: Yeah.

[Plaintiff's Counsel]: And was it your understanding, after you learned about this, that what had happened is there was refrigerant inside the water system and that, when the cap—the end cap loosened out, that it blew it out with force? Is that—was that your understanding of what happened?

[Defendants' Counsel]: Object to the form. Do you have an understanding of what happened? Go ahead. You can answer.

[Fowler]: Nobody ever came right out and said it, but I kind of figured.

[Plaintiff's Counsel]: Figured what?

[Fowler]: That something had gave, and the gas had got over there on the water side.

[Plaintiff's Counsel]: Yes, sir. And that caused the end cap to blow off?

[Fowler]: Right.

. . . .

[Plaintiff's Counsel]: Now, we covered before the break that, if water was in the tubes that were in the heat exchanger, that, if it froze, it could damage the tubes; is that right?

[Fowler]: Right.

[Plaintiff's Counsel]: And if there was refrigerant surrounding the tubes, and they broke, then the refrigerant could get into the water system that way, couldn't it?

[Fowler]: Yes, it could.

[Plaintiff's Counsel]: And then, if the water system had this refrigerant in it, that would be why there would be pressurized gas in the water system; is that right?

[Defendants' Counsel]: Object to the form.

[Fowler]: Right.

[Plaintiff's Counsel]: And the gas would have been trapped if it got in there after you put the caps on; right?

[Fowler]: Yes.

[Plaintiff's Counsel]: And then, if the cap was loosened, the gas would be the cause for expelling the cap outward from the water pipe. Would you agree with that?

[Defendants' Counsel]: Object to the form.

[Fowler]: I agree.

Matthews similarly testified to his understanding of the process by which Decedent was injured in his deposition:

[Plaintiff's Counsel]: And so if the tubes inside the coolant chamber broke, then the coolant that surrounded those tubes could get into the water system, couldn't it?

[Defendants' Counsel]: Objection to form.

[Matthews]: Yes.

[Plaintiff's Counsel]: And these refrigerants were like the nitrogen? They were pressurized gas; is that right?

[Defendants' Counsel]: Objection.

[Matthews]: I believe so, yes.

[Plaintiff's Counsel]: Okay. So if, on January 20th of 2017, when [Decedent] went to start loosening the nuts on the flanges, if there was pressurized gas in there, that could have caused the end cap to shoot out and hit him in the head, couldn't it?

[Defendants' Counsel]: Objection to form.

[Matthews]: I believe so.

The majority asserts Defendants' deposition testimony reflected only an understanding of "the sequence of events; not whether the outcome was foreseeable." The majority improperly infers that its interpretation of the Defendants' depositions is the only way to interpret that testimony. While that is one interpretation of the testimony, a reasonable juror could also infer that because Defendants understood the process of creating a closed, pressurized system, an injury to an individual opening that pressurized system was foreseeable. Moreover, "[i]t is not essential, . . . in order that the negligence of a party which causes an injury should become actionable, that the injury in the precise form in which it in fact resulted, should have been foreseen." *Drum v. Miller*, 135 N.C. 204, 215, 47 S.E. 421, 425 (1904). *See also Hall v. Coble Dairies*, 234 N.C. 206, 210, 67 S.E.2d 63, 66 (1951) ("[I]t is not necessary that the tort-feasor should have been able to foresee the injury in the precise form in which it occurred, nor to have been able to anticipate the particular consequences ultimately resulting from the negligent act or omission.").

This is not to say that the majority's assessment is unreasonable or less reasonable—the point is that it is not our role to draw those inferences. Indeed, Rule

14

56 "does not contemplate that the court will decide an issue of fact, but rather will determine whether a real issue of fact exists." *Kessing*, 278 N.C. at 534, 180 S.E.2d at 830 (citations omitted). Rather, our Courts have consistently affirmed that it is the role of the jury, in all but the exceptional case, to determine negligence. *See e.g.*, *Jenrette Transp. Co. v. Atl. Fire Ins. Co.*, 236 N.C. 534, 540, 73 S.E.2d 481, 486 (1952); *Gladstein v. S. Squire Assocs.*, 39 N.C. App. 171, 173, 249 S.E.2d 827, 828 (1978), *rev. denied*, 296 N.C. 736, 254 S.E.2d 178 (1979); *Cullen v. Logan Devs., Inc.*, 289 N.C. App. 1, 5, 887 S.E.2d 455, 458 (2023). This is particularly true as to the issue of negligence, where "[t]he jury has generally been recognized as being uniquely competent to apply the reasonable man standard[.]" *Green v. Wellons, Inc.*, 52 N.C. App. 529, 531-32. 279 S.E.2d 37, 39 (1981) (quoting *Gladstein*, 39 N.C. App. at 174, 249 S.E.2d at 829).

Additionally, Plaintiff presented evidence portions of Fowler's and Matthews' affidavits contradicted their deposition testimony. For example, in Fowler's affidavit accompanying Defendants' Motion for Summary Judgment, Fowler stated "it never occurred to [him] that the [C]hiller could become pressurized" when capping the pipes. Further, "[e]ven if [he] had known the [C]hiller pipes could not be completely drained of water, it would not have occurred to [him] that the system could become pressurized if [Defendants] put caps over the open pipes." Matthews' affidavit contains identical paragraphs, although his deposition testimony likewise demonstrated an understanding of how the Chiller became pressurized. These

15

statements are in contrast to Fowler's and Matthews' deposition testimony, recounted in part above, showing their understanding of how the Chiller became pressurized in just such a manner. Such contradictions raise an issue of Fowler's and Matthews' credibility. *See Kidd*, 289 N.C. at 367-68, 222 S.E.2d at 408-09. "Clearly, if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial, inasmuch as this situation presents the type of dispute over a genuine issue of material fact that should be left to the trier of fact." *Id.* at 367-68, 222 S.E.2d at 409.

Further, Defendants' own expert wrote in his report: "When the chillers are not operating, the refrigerant system is under higher pressure than the chilled water piping system. When not operating, any leaks in the evaporator tubes allow higher pressure refrigerant to enter the chilled water piping system." Defendants' own expert testified it was reasonable to expect someone would have to take the caps off because a person had put them on. Based on this evidence, a jury could find Defendants reasonably should have foreseen the risk of injury if they improperly shut down the Chiller. Moreover, the contradictions between Defendants' deposition testimony and affidavits clearly raise an issue of credibility which should be resolved by a jury. *See Kessing*, 278 N.C. at 535, 180 S.E.2d at 830 ("If there is *any question as to the credibility of witnesses* or the weight of evidence, a summary judgment should be denied." (emphasis added) (citation omitted)). Defendants make colorable

arguments around foreseeability, but so too does Plaintiff. Accordingly, there is a triable issue of fact as to whether Decedent's injury was reasonably foreseeable. Consequently, the trial court erred by granting Defendants' Motion for Summary Judgment.

II.    Contributory Negligence

"Contributory negligence is negligence on the part of the plaintiff which joins, simultaneously or successively, with the negligence of the defendant alleged in the complaint to produce the injury of which the plaintiff complains." *Proffitt v. Gosnell*, 257 N.C. App. 148, 152, 809 S.E.2d 200, 204 (2017) (citation and quotation marks omitted). "In order to prove contributory negligence on the part of a plaintiff, the defendant must demonstrate: '(1) [a] want of due care on the part of the plaintiff; and (2) a proximate connection between the plaintiff's negligence and the injury.'" *Daisy v. Yost*, 250 N.C. App. 530, 532, 794 S.E.2d 364, 366 (2016) (quoting *W. Constr. Co. v. Atl. Coast Line R. Co.*, 184 N.C. 179, 180, 113 S.E.2d 672, 673 (1922)). "It is well established that a claim is barred by the doctrine of contributory negligence if the injured party fails to exercise ordinary care for her own safety and such failure contributes to the injury." *Williams v. Odell*, 90 N.C. App. 699, 702, 370 S.E.2d 62, 64 (1988). "As our appellate courts have long recognized, negligence claims and allegations of contributory negligence should rarely be disposed of by summary judgment." *Patterson v. Worley*, 265 N.C. App. 626, 628, 828 S.E.2d 744, 747 (2019) (quoting *Sims v. Graystone Ophthalmology Assocs., P.A.*, 234 N.C. App. 65, 68, 757

S.E.2d 925, 927 (2014)).

Defendants point to Decedent's experience, training, and knowledge in support of their contention there is no genuine issue of material fact as to his contributory negligence. They allege Decedent failed to check pressure relief valves or stand clear of the metal before loosening the bolts, and these failures constitute contributory negligence.

Plaintiff produced evidence showing Decedent looked at pressure gauges, which read "zero," indicating the Chiller was not pressurized. Plaintiff also produced evidence showing Decedent loosened the nut on the flange before removing the cap and checked for noise, smell, or other indications of pressure, and there were none. Lastly, Plaintiff's evidence showed Defendants did not warn Decedent they had not filled the Chiller's tubes with antifreeze. Based on this evidence, a jury could determine Decedent could not reasonably have anticipated the Chiller was improperly drained and thus pressurized, and therefore find Decedent was not contributorily negligent.

In support of their position, Defendants cite to cases which are distinguishable from the facts of this case. Defendants point first to an unpublished opinion of this Court in which we upheld a trial court's grant of summary judgment where the evidence showed the plaintiff, a service technician, fell off of a ladder he had "merely visually inspected and touched . . . to make sure it was not wobbling." *Sealey v. Farmin' Brands, LLC*, 273 N.C. App. 710, *1, 847 S.E.2d 924 (2020) (unpublished).

Unpublished opinions are not controlling legal authority. N.C.R. App. P. Rule 30(e)(3) (2023). Still, the present case is distinguishable because there is evidence Decedent took greater efforts to check whether the Chiller was pressurized, including reading the pressure gauge and looking for signs of pressurization when first loosening the nut on the flange. These efforts also distinguish this case from another which Defendants cite in passing where the plaintiff made no attempt at all to inspect a scaffold before climbing onto it. *Bullard v. Elon Dickens Constr. Co., Inc.*, 29 N.C. App. 483, 486, 224 S.E.2d 708, 710 (1976).

The majority's position on contributory negligence plainly contradicts its position on foreseeability. The majority asserts Decedent's injury was not foreseeable, even considering Decedent's supervisor's experience, as well as the Chiller's manual and warning labels. Yet, in the majority's view, Decedent failed to exercise objectively reasonable behavior to prevent his injury. If Decedent's injury was not foreseeable, what additional actions should Decedent have undertaken to prevent his injury? Indeed, Decedent's supervisor, whose testimony the majority cites approvingly throughout its opinion, expressly said "I would have done the same thing [Decedent] and Nate did." The majority effectively holds Decedent's injury was unforeseeable as to Defendants, but Decedent should have taken steps to prevent it. Both cannot be true.

In addition, the majority points to *Moseley v. Hendricks* to support its conclusion Decedent was contributorily negligent. _ N.C. App. _, 897 S.E.2d 680

(2024). There, a golfer was found contributorily negligent where he put himself in front of a driving range and took no precautions to determine whether his position was safe. *Id.* at 685. *Moseley*, too, is readily distinguishable from the case before us. Here, unlike the golfer in *Moseley* who took no precautions, Decedent took several precautions, including reading the pressure gauges on the Chiller and checking for signs of pressurization after initially loosening the nut on the flange. Further, this Court in *Moseley* stated "a prudent person in plaintiff's position would have noticed such a precarious position and moved out of harm's way." *Id.* In contrast, again, Decedent's supervisor in this case testified that had he been present after the initial loosening of the nut without any indication of pressure, "I would have done the same thing [Decedent] and Nate did." Although Defendants point to deposition testimony by Decedent's supervisor as to his experience and training in support of their argument, they cannot dismiss this portion of his testimony.

Thus, on the issue of contributory negligence, Defendants' evidence is not so conclusive as to render there no genuine issue of material fact on this point. Therefore, the trial court erred in granting summary judgment in favor of Defendants.

## Conclusion

Accordingly, for the foregoing reasons, I respectfully dissent.

20